# In the United States Court of Federal Claims

No. 23-708 C
(Filed Under Seal: September 22, 2023)
Reissued: October 11, 2023[*]

```
* * * * * * * * * * * * * * * * * *
                                 *
SPARKSOFT CORPORATION,           *
                                 *
                  Plaintiff,     *
                                 *
       v.                        *
                                 *
THE UNITED STATES,               *
                                 *
                  Defendant,     *
                                 *
and                              *
                                 *
LEIDOS, INC.,                    *
                                 *
                  Defendant-Intervenor.  *
                                 *
* * * * * * * * * * * * * * * * * *
```

*David B. Dixon*, with whom was *Meghan D. Doherty*, *Robert C. Starling*, *Toghrul M. Shukurlu*, and *Aleksey R. Dabbs*, Pillsbury Winthrop Shaw Pittman, LLP, of McLean, Virginia, for Plaintiff.

*Stephen J. Smith*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for Defendant, and *Douglas Kornreich*, Assistant Deputy Associate General Counsel, United States Department of Health and Human Services, of Washington, D.C., of counsel.

*James J. McCullough*, with whom was *Michael J. Anstett*, and *Katherine L. St. Romain*, Fried, Frank, Harris, Shriver, & Jacobson LLP, of Washington, D.C., for Defendant-Intervenor.

## OPINION AND ORDER

**SOMERS**, Judge.

---

[*] Pursuant to the protective order entered in this case, this opinion was initially filed under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion. In addition, the Court made minor typographical and stylistic corrections.

On May 12, 2023, Plaintiff, Sparksoft Corporation ("Sparksoft"), filed this post-award bid protest seeking to enjoin the Centers for Medicare and Medicaid Services ("CMS" or the "agency") from proceeding with a task order awarded to Defendant-Intervenor, Leidos, Inc. ("Leidos"), which was solicited to provide comprehensive support services for CMS's National Data Warehouse.  For the reasons that follow, the Court finds that Sparksoft has failed to demonstrate that CMS's decision was in error.  Accordingly, the government and Leidos are entitled to judgement on the administrative record, and Sparksoft's motion for judgment on the administrative record and its accompanying request for permanent injunctive relief are denied.

## BACKGROUND

The procurement at issue involves CMS, a federal agency within the Department of Health and Human Services and the largest purchaser of health insurance in the United States. AR 515.  CMS's mandate includes providing individuals with "accurate, timely, and relevant information" about their health insurance options.  *Id.*  To that end, "CMS operates a toll-free, nationwide, 24x7 contact center" to provide customer service and generally assist individuals with their healthcare needs.  *Id.*  CMS created the National Data Warehouse ("NDW") "to support the operational and business analytics reporting needs of contact center operations . . . ." AR 516.  The NDW is "the central repository for capturing, aggregating, and analyzing information related to the beneficiary experience with Medicare and the consumer experience with Marketplaces."  *Id.*  The "NDW also serves as a foundation for operational and management reporting to support improved decision-making, business practices, and services to callers."  *Id.*  CMS "uses the data stored in the NDW to monitor, forecast, trend, analyze, and report on the performance of the [Call Center Operations] contract and all channels of communication available to Medicare Beneficiaries and Marketplace Consumers."  *Id.*  The scope of the Request for Quote "include[d] all activities (end-to-end) necessary to develop, engineer, maintain, and operate the NDW services that support CMS requirements."  *Id.*

## A.    The Solicitation

The award at issue was to be made pursuant to the terms of RFQ 230187 ("RFQ"), a FAR subpart 8.4 procurement issued under the General Services Administration ("GSA") Federal Supply Schedule ("FSS") contracts for Information Technology Professional Services, Special Item Number 54151S.  AR 445, 491, 1987.  The terms of the RFQ divided the submission and consideration of bids into six different factors (excluding price).  AR 492–93.  Additionally, bids were to be submitted and evaluated in three separate phases, with each respective phase only considering certain factors.  *See id.*

During the first phase—aptly named, "Phase One"—CMS was to evaluate bidders solely regarding their corporate experience.  *See* AR 492.  After Phase One, unqualified offerors were to be eliminated and those recommended to proceed were instructed to submit proposals for Phase Two.  AR 492–93.[1]  In Phase Two, CMS was to evaluate the remaining competitors' oral presentations.  AR 494.  Finally, Phase Three would involve the evaluation of all the remaining non-price factors: Factor 3, Technical Understanding and Approach and Quality Assurance

---

[1] The RFQ provided that unsuccessful offerors "may still participate in Phase Two if they elect to do so."  AR 493.

Surveillance Plan ("QASP"); Factor 4, Small Business Utilization; Factor 5, Section 508
Compliance; and Factor 6, Business Size and Socio-Economic Status. *Id.* Price quotations were
also to be submitted during Phase Three. *Id.*

The RFQ provided that the task order would be awarded to the quotation that
"represent[s] the Best Value to the Government, as defined in FAR 2.101 and described in FAR
8.405." AR 490; *see also* FAR 2.101 ("*Best value* means the expected outcome of an acquisition
that, in the Government's estimation, provides the greatest overall benefit in response to the
requirement."); FAR 8.405-1 (listing factors that an agency may consider when determining best
value, including "[p]ast performance" and "[s]pecial features of the supply or service required
for effective program performance"). Additionally, it specified the order of importance in which
all the factors should be considered with Factor 1 (Corporate Experience) being the most
important, followed by Factor 3 (Technical Understanding and Approach and Quality Assurance
Surveillance Plan (QASP)), then Factor 2 (Oral Presentation), Factor 4 (Small Business
Utilization), Factor 5 (Section 508 Compliance), and Factor 6 (Business Size and Socio-
Economic Status), while noting that all of the factors, "when combined, are significantly more
important than cost or price." AR 490.

Furthermore, the RFQ recommended a method by which the Technical Evaluation Panel
("TEP") could evaluate these factors but did not mandate its use. *Id.* Specifically, it stated that
"[w]hen evaluating non-price factors, the Government anticipates the assessment of confidence
levels (e.g., high, some, or low confidence in the ability of the respondent to successfully pursue
achievement of the Government's intent, with the expectation of little need for Government
intervention). However, the Government reserves the right to use whatever evaluation
methodology it chooses including something other than previously anticipated." *Id.* (emphasis
omitted).

## B.    Evaluation and Award

CMS received Phase One bids from seven vendors, but only three participated in all three
evaluation phases: Sparksoft, ███████, and Leidos (the incumbent contractor). Of the seven
offerors, the TEP concluded that ███████, Leidos, and Sparksoft were "capable and suitable for
performing the work required by the [Performance Work Statement ("PWS")] with little need for
Government intervention based on the degree of relevance of each respondent's recent
experience." AR 1940. Accordingly, CMS invited each of these three offerors to participate in
Phase Two of the procurement. *Id.* In Phase Two, the TEP evaluated each offeror's oral
presentation and determined "with HIGH CONFIDENCE that all of the respondents are capable
and suitable for performing the work required by the PWS." AR 1926. Therefore, the TEP
recommended that ███████, Leidos, and Sparksoft be invited to participate in Phase Three. *Id.*
The Contracting Officer adopted the TEP's findings and recommendations. *See* AR 1975.

During Phase Three, the TEP assessed the bids, summarized its findings, and presented
them to CMS. *See* AR 1990. Phase Three included evaluation of Factor 3, Factor 4, Factor 5,
and Factor 6. AR 493. The following chart summarizes the results of TEP's evaluation of the
non-price factors:

|  | Factor 1 | Factor 2 | Factor 3 | Factor 4 | Factor 5 | Factor 6 |
|---|---|---|---|---|---|---|
| Sparksoft | High Confidence | High Confidence | Low Confidence | High Confidence | High Confidence | High Confidence |
| Leidos | High Confidence | High Confidence | High Confidence | High Confidence | Some Confidence | Low Confidence |
| ▮▮▮▮ | High Confidence | High Confidence | Some Confidence | High Confidence | High Confidence | Low Confidence |

*See* AR 1990.

Within these ratings, CMS determined that Leidos was superior to ▮▮▮▮ and Sparksoft on Factor 1, Factor 2, and Factor 3.  AR 2036–42.  Moreover, CMS found that Sparksoft was superior in Factor 4 and Factor 6.  AR 2042–43.  CMS also determined that Sparksoft and ▮▮▮▮ were equally superior with regard to Factor 5.  *Id.*  The following chart summarizes these ratings:

| Respondent | Factor 1 Corporate Experience | Factor 2 Interview (Oral Presentation) | Factor 3 Technical Understanding & Approach and QASP | Factor 4 Small Business Utilization | Factor 5 Section 508 | Factor 6 Business Size and Socio-Economic Status |
|---|---|---|---|---|---|---|
| Leidos | Superior | Superior | Superior |  |  |  |
| ▮▮▮▮ |  |  |  |  | Equally Superior |  |
| Sparksoft |  |  |  | Superior | Equally Superior | Superior |

AR 2043.

Regarding price proposals, the offerors quoted the following prices: Leidos bid $53,221,336.93, Sparksoft bid $▮▮▮▮, and ▮▮▮▮ bid $▮▮▮▮.  AR 2044–45.[2] Upon reviewing all of the proposals, CMS determined that Leidos's represented the best value.

---

[2] CMS identified issues in both ▮▮▮▮ and Sparksoft's price proposals and determined that "[i]f the government elected to enter into negotiations, the overall quoted price for each of the respondents would likely increase . . . ."  AR 2044.

AR 2048.  CMS determined that Leidos's "technical[] superior[ity] in the three most important evaluation factors" justified paying Leidos $█████, a █% premium over the 5-year period of performance.  *Id.*  As such, CMS awarded the task order to Leidos.  *Id.*

## DISCUSSION

### A.    Legal Standard

In a bid protest, this Court reviews an agency's procurement decisions under the standards set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); *see also* 5 U.S.C. § 706.  The Federal Circuit created a two-part test to determine the merits of a bid protest under the APA standard.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the protestor must show that the agency action in question is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Accordingly, this prong of the test is satisfied if either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure."  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Second, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process."  *Id.* (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  In a post-award protest, a protestor establishes that it has suffered a prejudicial error by demonstrating that "there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process."  *Bannum*, 404 F.3d at 1358 (citations omitted).

Moreover, in reviewing an agency's procurement decisions, the Court's task is not to "substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368–69 (Fed. Cir. 2009) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (stating that under "'highly deferential' rational basis review," courts will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'")).  Rather, the protestor "bears a heavy burden," and the agency is "entitled to exercise discretion upon a broad range of issues . . . ."  *Impresa*, 238 F.3d at 1332–33 (citations omitted).  Nonetheless, the APA requires the Court to intervene in cases in which agency action is unreasonable.  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citation omitted).  "This standard requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision."  *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).  Thus, the Court must determine, based on evidence in the administrative record referenced by the protestor, "whether the decision was based on the relevant factors and whether there has been a clear error of judgment."  *Citizens to Pres. Overton Park*, 401 U.S. at 416.

Finally, bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims, which requires the Court to "make factual findings from the record evidence as if it were

conducting a trial on the record." *Bannum*, 404 F.3d at 1354. "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id.* at 1355–56. Therefore, in reviewing cross-motions for judgment on the administrative record, the Court's task is to determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) (citation omitted).

**B.     Analysis**

In challenging CMS's award of the contract at issue to Leidos, Sparksoft takes issues with the manner in which CMS evaluated three of the six evaluation factors: Factors 1, 3, and 5. *See generally* ECF No. 24 ("Pl.'s MJAR") at 6–28. In addition, Sparksoft asserts that CMS's overall best value determination was in error. *Id.* at 28–32. As a result, Sparksoft concludes that the evaluation of Factors 1, 3, and 5 plus the best value determination prejudiced it. *See generally id.* at 28–32. However, as discussed below, Sparksoft failed to meet its burden to show that any of the protested agency decisions were unreasonable.

**1.     CMS's Evaluation of Factor 1: Corporate Experience**

Sparksoft claims that "CMS'[s] evaluation of Factor 1: Corporate Experience, the most heavily weighted evaluation factor, was arbitrary and capricious because CMS failed to follow the terms of the Solicitation and otherwise improperly favored Leidos based on its incumbent status." Pl.'s MJAR at 6. Plaintiff's argument is threefold. First, Sparksoft claims that "the [Contracting Officer] essentially eliminated any consideration of questions 2 and 3 from the Factor 1 evaluation, in contravention of the Solicitation." *Id.* at 9. Second, it contends that "the [Contracting Officer's] Factor 1 evaluation was arbitrary and capricious for the separate reason that the SSA improperly credited Leidos for being the incumbent." *Id.* at 9–10. Finally, it alleges that "the [Contracting Officer's] rationale for finding Leidos to be superior is arbitrary and capricious because it is largely based on findings that are unrelated to Leidos' Factor 1 quotation." *Id.* at 10–12. For the reasons that follow, the Court finds that Sparksoft failed to demonstrate that CMS erred in awarding the task order to Leidos.

**a.     Terms of the RFQ**

Under Factor 1, the RFQ required offerors to submit proposals describing their recent corporate experience. AR 494–95. Specifically, offerors were asked to respond to twelve questions, each relating to their prior experience. *See* AR 495–98. The first question simply asked offerors to "review[] the organizational conflict of interest information outlined in . . . th[e] solicitation," AR 495, and is not at issue in this protest. *See* Pl.'s MJAR at 6 n.1; ECF No. 26 ("Gov.'s MJAR") at 11 n.2; ECF No. 27 ("Def-Int.'s MJAR") at 10 n.1 (noting that "[t]he quoters' responses to this first question are not at issue in this protest"). The remaining eleven questions related to various aspects of each offeror's corporate experience. *See* AR 495–98. For these questions, each offeror was to respond stating whether they: "Strongly Agree," "Agree," "Partially Agree," or "Disagree," with the respective prompt. *Id.* Moreover, any response of "Strongly Agree," was to be accompanied by a "narrative"—not to exceed one page in length—

describing the offeror's "depth and breadth of recent experience performing the work described in [the] question." AR 495.

Additionally, the RFQ stated that CMS should use these responses to evaluate whether each offeror could demonstrate that it was capable of performing the work described in the PWS. *See* AR 498. Specifically, CMS committed to using these submissions to "assess the capability and suitability of the [bidders] to perform the work required by the PWS by evaluating the degree of relevance in the recent experience described in the quote." *Id.*

### b.  Submissions and CMS's Evaluation

Both Sparksoft and Leidos answered "Strongly Agree" to all eleven of the relevant questions and provided the requisite accompanying narrative responses. AR 705–715 (████), 738–48 (Leidos), 754–64 (Sparksoft). The TEP evaluated the responses and summarized its findings. *See* AR 1930–40. For each respective question, the TEP analyzed the narrative responses by comparing them to the requirements of the PWS. *See id.* The TEP's findings illustrate that Leidos' narrative response to Question 2 failed to adequately describe two elements of the PWS, *see* AR 1930, and Leidos' narrative response to Question 3 failed to adequately describe one element, *see* AR 1932. Comparatively, Sparksoft's Question 2 response failed to adequately describe one element. *See* AR 1930. Nevertheless, the TEP ultimately "concluded with high confidence" that both Sparksoft and Leidos (as well as ████) were "capable and suitable for performing the work required by the PWS with little need for Government intervention." AR 1940.

Thereafter, the Contracting Officer reviewed the TEP's findings, "performed an independent review of the quotes," and ultimately agreed with the TEP's conclusion that both Leidos and Sparksoft deserved "High Confidence" ratings. AR 2036–37. In the award decision, the Contracting Officer acknowledged the deficiencies in Leidos's responses to Questions 2 and 3, noting that "the TEP made findings where Leidos didn't fully describe experience relevant to elements of the PWS, including integrating and loading data from heterogeneous source systems into AWS Redshift (PWS 5.3.2), maintaining technical documentation pertinent to extract, transfer, and load (PWS 5.3.2), and trending data quality information by subject area and data source provider (PWS 5.3.4)." AR 2037. However, she also explained that, although Leidos failed to adequately describe these elements, it "did cite 16 years of very relevant data integration and data quality experience managing and performing work on the [NDW]," as well as "relevant data integration experience from [the] Social Security Administration's (SSA) Information Technology Support Services." *Id.* Furthermore, she noted that the three elements of the PWS for which Leidos did not fully describe its experience were "minor" and ultimately "did not decrease the TEP's confidence in Leidos' ability to support the NDW requirements." *Id.* Thus, the Contracting Officer found that "the TEP's evaluation was reasonable and performed in a manner consistent with the RFQ." AR 2036.

The award decision also included the Contracting Officer's best value analysis, wherein she compared Leidos's corporate experience to that of Sparksoft. *See* AR 2045–46. In her analysis, the Contracting Officer noted that "the TEP made findings where Leidos didn't fully describe experience relevant to elements of the PWS" and that "the TEP made findings where

Leidos didn't fully describe experience relevant to elements of the PWS, including integrating and loading data from heterogeneous source systems into AWS Redshift (PWS 5.3.2), maintaining technical documentation pertinent to extract, transfer, and load (PWS 5.3.2), and trending data quality information by subject area and data source provider (PWS 5.3.4)."  AR 2037.  Once again, however, the Contracting Officer considered that Leidos "did cite 16 years of very relevant data integration and data quality experience managing and performing work on the CMS National Data Warehouse (NDW)," as well as other "relevant data integration experience," *id.*, and thus the Contracting Officer ultimately concluded that Leidos's Factor 1 proposal was superior to Sparksoft's and ████'s.  *Id.*

### c. CMS's Evaluation of Factor 1 was Reasonable and Consistent with the Terms of the RFQ

After reviewing the portions of the administrative record that the parties cited in their briefs, the Court finds that CMS's evaluation of the offerors' proposals as it pertains to Factor 1 was reasonable and consistent with the terms of the RFQ.  While the TEP found that Leidos's submission did not fully describe its experience relative to every element of the PWS, the TEP nonetheless concluded that Leidos was just as capable of performing the work in the PWS as Sparksoft and ████ and, therefore, awarded Leidos a "High Confidence" rating on corporate experience.  AR 1940.  Contrary to Sparksoft's arguments, the "High Confidence" rating Leidos was awarded is consistent with the terms of the RFQ, which instructed CMS to prioritize the *relevancy* of the bidders' experience.  AR 498.  This appears to be precisely what the Contracting Officer did in her best value analysis.

First, Sparksoft posits that the Contracting Officer erred in evaluating Factor 1 by "entirely disregarding the TEP's findings with respect to [questions 2 and 3]."  Pl.'s MJAR at 9.  As explained above, the TEP found that Leidos failed to adequately describe its experience in response to three elements of the PWS and that Sparksoft's submission failed to adequately describe its experience as to a single element.  *Id.*  Because Leidos did not adequately describe three elements, whereas Sparksoft only failed to adequately describe one, Sparksoft concludes that it should have necessarily received a higher rating than Leidos on Factor 1.  *See id.*  According to Sparksoft, the Contracting Officer did not "reasonably consider[] these findings for purposes of the best value determination," because, if she had, "she would have concluded that Sparksoft's Factor 1 quotation was superior to that of Leidos (and ████)."  *Id.*  In addition, Sparksoft deduces from this that the Contracting Officer must have "entirely disregard[ed] the TEP's findings with respect to these questions, . . . essentially eliminat[ing] any consideration of questions 2 and 3 from the Factor 1 evaluation, in contravention of the Solicitation."  *Id.*

However, contrary to Sparksoft's assertions, the Contracting Officer clearly considered the TEP's findings regarding certain elements within questions 2 and 3 and found that they were "minor" factors in comparison to the relevancy of Leidos's overall corporate experience.  Initially, it should be clarified that although Sparksoft claims the agency "essentially eliminated any consideration of questions 2 and 3," the only record evidence Sparksoft presents in support of this claim is the allegation that CMS chose to disregard a discrepancy between itself and Leidos as to the number of PWS elements that the TEP found were unaccounted for within their responses to those questions.  *Id.*  Therefore, Sparksoft's claim that the agency "essentially

eliminated any consideration" of the entirety of questions 2 and 3 is simply inaccurate.  The TEP did not find that Leidos (or Sparksoft for that matter) completely failed to respond to either question 2 or 3; rather, the TEP determined that Leidos did not adequately respond to subparts of questions 2 and 3, and that Sparksoft failed to adequately respond to one subpart of question 2.  *See* AR 1930–32.  This is a far cry from Leidos fully failing to respond to questions 2 and 3, and an even farther cry from the agency "essentially eliminat[ing] any consideration of questions 2 and 3," as alleged by Sparksoft.  Pl.'s MJAR at 9.

Moreover, beyond conjecture, Sparksoft points the Court to nothing in the record to support its argument that the agency did not consider questions 2 and 3.  This is likely due to the fact that the record demonstrates that the agency did, in fact, consider questions 2 and 3.  Indeed, the Contracting Officer directly acknowledges that "the TEP made findings where Leidos didn't fully describe experience relevant to elements of the PWS," and specifically mentions the elements of Leidos's evaluation that Sparksoft claims she ignored.  AR 2037 (noting that "the TEP made findings where Leidos didn't fully describe experience relevant to elements of the PWS, including integrating and loading data from heterogeneous source systems into AWS Redshift (PWS 5.3.2), maintaining technical documentation pertinent to extract, transfer, and load (PWS 5.3.2), and trending data quality information by subject area and data source provider (PWS 5.3.4)").  Furthermore, the Contracting Officer explains exactly how she considered the flaws in Leidos's proposal regarding questions 2 and 3 in the context of the RFQ's evaluation criteria.  The RFQ required that evaluators "assess the capability and suitability of the [bidders] to perform the work required by the PWS by *evaluating the degree of relevance in the recent experience described* in the quote."  AR 498 (emphasis added).  Consistent with this evaluation of relevancy, the Contracting Officer stated that although Leidos did not fully describe these elements, it "did cite 16 years of very relevant data integration and data quality experience managing and performing work on the CMS National Data Warehouse (NDW)," as well as other "relevant data integration experience from Social Security Administration's (SSA) Information Technology Support Services . . . ."  AR 2037.  Thus, not only did the Contracting Officer clearly consider the missing elements of Leidos's proposal, but she also explained how she considered them in accordance with the terms of the RFQ and found the missing elements to be "minor findings [that] did not decrease the TEP's confidence in Leidos' ability to support the NDW requirements."  *Id.*  The Contracting Officer made similar findings regarding elements of the Factor 1 questions that both ▮▮▮▮ and Sparksoft did not fully describe.  *See* AR 2037–38.  In short, Sparksoft's assertion that CMS ignored questions 2 and 3 in the Factor 1 evaluation is incorrect.

Building on this incorrect argument regarding questions 2 and 3,[3] Sparksoft next asserts that rather than properly evaluating offerors in accordance with the terms of the RFQ, CMS instead chose to award the contract to Leidos simply due to its incumbent status.  Pl.'s MJAR at 9–10 ("[T]he [agency]'s entire justification for finding Leidos to be superior to Sparksoft and ▮▮▮▮ under Factor 1 was based not on the contents of Leidos' Factor 1 quotation, but instead

---

[3] Despite Sparksoft's insistence to the contrary, *see* Pl.'s MJAR at 9 (noting that this argument is "separate" from its first), its second ground relates to its view that the Contracting Officer disregarded the TEP's findings with respect to questions 2 and 3.  Ultimately, the general allegation overarching the two claims is that the Contracting Officer disregarded the TEP's findings, and justified her disregard by pointing to the fact that Leidos was the incumbent.

on the fact that Leidos performed the incumbent contract.").[4]  To support this assertion, Sparksoft directs the Court to the award decision, wherein the Contracting Officer found Leidos's Factor 1 proposal superior to Sparksoft's "because their quoted corporate experience was directly relevant [to] the NDW Program."  Pl.'s MJAR at 10 (quoting AR 2038).  In Sparksoft's view, the Contracting Officer "is essentially conceding that she did not meaningfully evaluate Corporate Experience references in accordance with the terms of the RFQ" and thus violated the law by awarding the task order to Leidos "due solely to their incumbency or [CMS]'s assumption that an incumbent contractor will inherently perform the contract in a superior manner to a non-incumbent offeror."  *Id.* (quoting *Native Energy & Tech., Inc.*, B-416783, 2018 WL at *4).

Despite Sparksoft's insistence that the agency was improperly crediting Leidos due to its incumbency, the record shows that the Contracting Officer was acting well-within her discretion to consider the *relevancy* of Leidos's prior experience.  As explained above, "contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  *Impresa*, 238 F.3d at 1332 (internal quotation marks and citation omitted).  That discretion is even greater in cases in which—as here—the solicitation dictates the award be made to the bidder whose proposal represents the best value to the agency.  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone."); *accord E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").  Furthermore, it is well-established that "'[a]n agency . . . can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract.'"  *Plasan N. Am., Inc. v. United States*, 109 Fed. Cl. 561, 573 (2013) (quoting *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)).

The award decision shows that the Contracting Officer properly evaluated Leidos's experience based on the evaluation criteria in the RFQ.  As mentioned previously, the evaluation criteria stated that "CMS w[ould] assess the capability and suitability of [each] respondent to perform the work required by the PWS *by evaluating the degree of relevance in the recent experience described* in the quote."  AR 498 (emphasis added).  Additionally, Leidos's experience as the incumbent was directly responsive to seven out of the twelve Factor 1

---

[4] In its Reply brief, Sparksoft claims that its position is not that Leidos was awarded the contract solely based on its incumbent status, but rather that CMS erred by assuming Leidos's experience as the incumbent was more relevant than that of the other bidders—without actually providing any analysis.  *See* ECF No. 31 ("Pl.'s Reply") at 10 (citing *Native Energy & Tech., Inc.*, B-416783, 2018 WL 7569536 (Comp. Gen. Dec. 13, 2018) ("While it may be true that an incumbent's experience may be relevant to a follow-on procurement, that does not relieve an agency of its obligation to evaluate all vendors in accordance with the requirements of the RFQ.").  Specifically, Sparksoft alleges that the Contracting Officer "essentially excused Leidos' failure to meet Factor 1 instructions solely because Leidos is the incumbent."  Pl.'s Reply at 11.  However, Sparksoft's argument still suffers from the same flaws.  As explained in the preceding paragraphs, the Contracting Officer did not assume anything; rather, she *evaluated* the relevancy of Leidos's incumbent experience along with the other corporate experience Leidos described in its answers to the Factor 1 questions, precisely in accordance with the requirements of the RFQ.

questions, as they all mentioned relevancy or scope of experience.  *See* AR 495–97 (Questions 2–5, 7, and 9 all ask whether the bidder's experience is with a system or intelligence solution "of similar scope and complexity to NDW").  Clearly, Leidos's experience as the incumbent was highly relevant to CMS, not in and of itself, but because it provided Leidos with exceedingly relevant corporate experience.  Thus, by finding Leidos's Factor 1 proposal superior to Sparksoft's "because their quoted corporate experience was directly relevant [to] the NDW Program," the Contracting Officer properly evaluated Leidos's experience based on the evaluation criteria in the RFQ.  AR 2038.

Finally, Sparksoft claims that CMS improperly considered Leidos's proposed staffing approach—a criteria of Factor 3—as part of its Factor 1 evaluation.  In the award decision, as part of her Factor 1 analysis, the Contracting Officer states that "Leidos provides staff with direct NDW program experience."  *Id.*  Sparksoft argues that this consideration was improper because "the [RFQ] did not permit CMS to evaluate vendors' proposed staffing approaches as part of the Factor 1: Corporate Experience evaluation," but rather, "staffing was to be considered as part of the evaluation of Factor 3: Technical Understanding and Approach."  Pl.'s MJAR at 11.  Additionally, Sparksoft notes that the Contracting Officer's Factor 1 analysis also considered that "Leidos provides turn-key, tailored and proven processes, tools and capabilities that will significantly reduce risk to the government."  *Id.* (quoting AR 2038).  Sparksoft then asserts that the RFQ "did not permit CMS to evaluate [bidders]' proposed processes and tools . . . nor did it permit CMS to evaluate transition risk," in its Factor 1 analysis.  *Id.* (citing AR 495–98).  Thus, according to Sparksoft, by considering Factor 3 criteria in its Factor 1 evaluation, "CMS elevated the importance of Factor 3 in contravention of the language of the [RFQ]."  *Id.*

However, Sparksoft neglects to consider that the "staff" mentioned in the Contracting Officer's Factor 1 analysis is completely different from the "staffing plans" that were required to be included with Factor 3 submissions.  Under Factor 3, the RFQ only contemplated "staffing" insofar as it stated that submissions "should include an organizational chart and/or staffing plan illustrating, as applicable, the number of personnel, their job title and role" and "describe the [bidder]'s approach to staffing the proposed team including hiring plans/time-lines."  *See* AR 501.  Creating a "staffing plan" is obviously a far cry from the Contracting Officer considering the experience of Leidos' staff members in her Factor 1 analysis.  Furthermore, the Court finds it unreasonable to interpret the RFQ to prohibit CMS from considering the experience of an offeror's staff under the "Corporate Experience" factor.  From simply observing the twelve questions, the Court is unable to contemplate a scenario in which the experience that an offeror was requested to describe does not implicate the experience of its staff.  *See, e.g.*, AR 298–99 (questions requesting things such as "experience using a commercial off-the-shelf product(s) to extract and transform data," "experience planning and executing a comprehensive data quality plan," or "experience developing, managing, and executing a sound test plan").  Simply put, a corporation cannot "experience" things; only its staff can.  A corporation's experience in a services contract is largely only relevant to the extent that the staff that took part in gaining that experience remains employed by the corporation.  Thus, it would be unreasonable to interpret the terms of the RFQ to prohibit any consideration of an offeror's staff vis-à-vis the offeror's corporate experience under Factor 1.

Additionally, Sparksoft's claim that the RFQ did not permit the Contracting Officer to consider that Leidos "provide[d] turn-key, tailored and proven processes, tools and capabilities that will significantly reduce risk to the government," suffers from a similar issue.  Pl.'s MJAR at 11 (citing AR 2038).  Sparksoft bases its assertion on a general citation to the Factor 3 criteria.  *See id.* (citing AR 501).  Although Sparksoft does not explain to the Court how this general citation to Factor 3 supports its assertion, the Court assumes that Sparksoft is implying that, because the Factor 3 criteria includes references to things like "tools" and "methods," *see* AR 501, the Contracting Officer was not permitted to consider those things in her Factor 1 determination.  However, the Contracting Officer's Factor 1 findings had nothing to do with Factor 3, and Sparksoft pointed the Court to nothing whatsoever in the Factor 3 portion of Leidos' proposal that it even alleges the Contracting Officer relied on in conducting her Factor 1 analysis.  Rather, as the Contracting Officer stated in her decision, Leidos works "with NDW-specific technologies and data-source systems," has a "comprehensive knowledge of program stakeholders' needs and expectations," and performs "processes tailored for NDW."  AR 2038.  As far as the record shows, all of these findings were based on Leidos' Factor 1 proposal and the relevant experience described in its Factor 1 responses.  If Sparksoft believed that the Contracting Officer relied impermissibly on Leidos' Factor 3 responses in support of her Factor 1 evaluation, it was Sparksoft's burden to direct the Court to any record evidence that supports this assertion.  Sparksoft, however, did no such thing.  Instead, as with its preceding argument, Sparksoft relies solely on an overbroad interpretation of the Factor 3 criteria.  Accordingly, the Court cannot conclude that the Contracting Officer's Factor 1 determination relied on Factor 3 criteria.

### 2.  CMS's Evaluation of Factor 5: Section 508 Compliance

#### a.  Requirements of the RFQ and CMS's Evaluation

Factor 5 of the RFQ required each offeror to submit a Product Assessment Template ("PAT"), to demonstrate its ability to comply with section 508 of the Rehabilitation Act of 1973 (29 U.S.C. § 794d).  AR 503–04.  In general, section 508 requires that "when Federal agencies develop, procure, maintain, or use electronic and information technology, Federal employees with disabilities have access to and use of information and data that is comparable to the access and use by Federal employees who are not individuals with disabilities, unless an undue burden would be imposed on the agency."[5]  *Id.*  In order to ensure compliance with section 508, the RFQ committed CMS to evaluate each offeror's "understanding of the requirements and ability to meet applicable accessibility standards . . . based on the[ir] completed [PAT] and the respondent's ability to demonstrate compliance with the established 508 accessibility standards."  AR 504.

As required by the terms of the RFQ, Leidos, Sparksoft, and ▆▆▆▆ each submitted notional PATs with their Phase Three quotes.  AR 1062–72, 1456–73, 1885–1908.  Both ▆▆▆▆ and Sparksoft submitted PATs indicating compliance with all of the applicable Section 508

---

[5] "Section 508 also requires that individuals with disabilities, who are members of the public seeking information or services from a Federal agency, have access to and use of information and data that is comparable to that provided to the public who are not individuals with disabilities, unless an undue burden would be imposed on the agency."  AR 504.

standards.  *See* AR 1062–72, 1888–908.  Conversely, Leidos submitted a PAT showing a "Conformance Level" of "Does Not Support" for eleven of the fifty applicable section 508 criteria and only "Partially Supports" for another twenty.  *See* AR 1459–69.  Notably, at the outset of its PAT, Leidos explained that its PAT was "based on information provided by the vendor" and that Leidos simply resubmitted it to CMS without making any changes to its content.  AR 1456.

CMS utilized the PATs to "evaluate[] the [offerors'] understanding of the requirements and ability to meet applicable accessibility standards."  AR 307, 504, 1944.  Both Sparksoft and ██████ were assigned a "High Confidence" rating, while Leidos received a rating of "Some Confidence."  AR 1949, AR 1959, AR 1968.  Regarding Leidos, the TEP noted that its Factor 5 "Some Confidence" rating was due to its PAT failing to demonstrate compliance with every applicable section 508 standard.  AR 1969.

### b. CMS's Evaluation of Factor 5 was Reasonable and Consistent with the Terms of the RFQ

In its motion, Sparksoft maintains that CMS's evaluation of Leidos under Factor 5 was in error because CMS gave Leidos a "Some Confidence" rating despite its inability to demonstrate full compliance with each applicable section 508 criterion.  Pl.'s MJAR at 15–18.  The terms of the RFQ stated that offerors "must comply with established HHS EIT accessibility standards," AR 504, but, Sparksoft argues, Leidos submitted a PAT demonstrating it was "unable to fully support a significant number of the applicable accessibility standards," Pl.'s MJAR at 15.  According to Sparksoft, despite "fail[ing] to meet a material Solicitation requirement," CMS still assigned Leidos a "Some Confidence" rating.  *Id.* at 17.  Thus, Sparksoft claims CMS's evaluation was in error because, "[h]ad CMS reasonably evaluated Leidos' PAT, it would have determined that Leidos' quotation was *unacceptable* because it failed meet a material Solicitation requirement."  *Id.* (emphasis added).

As a threshold matter, the Court notes that Sparksoft's argument regarding Factor 5 is limited to the extent it appears in its briefing.  That is to say, despite counsel's attempt at oral argument to expand Sparksoft's Factor 5 argument beyond the PAT that Leidos submitted to other aspects of Leidos' section 508 compliance, Sparksoft's Factor 5 argument in its MJAR only addressed the PAT that Leidos submitted as part of its proposal.  *See* Pl.'s MJAR at 15 (citing AR 1456–73).  It is black-letter law that arguments not raised in opening or responsive briefing are waived.  *See, e.g.*, *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver.").  Therefore, the Court will only consider Sparksoft's Factor 5 argument as it relates to the PAT Leidos actually submitted.  Additionally, even if Sparksoft had put forth this expanded waived argument in its briefing, it appears it would be incorrect in any event, because Appendix B to the RFQ indicates that as far as software is concerned, the section 508 accessibility requirements only applied to the MicroStrategy software.  *See* AR 587 (the "Accessibility Requirements Statement" stating that "Software > MicroStrategy").

Turning to the merits, Sparksoft's argument (properly limited to what was actually briefed) fails.  The record is clear that CMS's assignment of a "Some Confidence" rating to

Leidos on Factor 5 was reasonable.  Indeed, contrary to Sparksoft's assertions, Leidos did not fail to comply with Factor 5's material requirements.  Rather, Leidos submitted a PAT that indicated that the software to be used was not fully compliant with the section 508 standards. However, for the reasons discussed below, failure to comply fully did not render Leidos' proposal unacceptable or require CMS to assign Leidos a "Low Confidence" rating on this factor.

First, Sparksoft's assertion that by "not discuss[ing] any remediation efforts whatsoever" Leidos' proposal was somehow unacceptable, is incorrect.  Pl.'s MJAR at 15.  Offerors were not required to discuss remediation efforts for non-compliant or partially compliant aspects of the software generally.  Instead, it is quite clear (and Sparksoft even quotes the applicable language in its MJAR)[6] that offerors only needed to document "any *underway* remediation efforts addressing conformance issues."  AR 504 (emphasis added).  Therefore, if Leidos did not have any underway remediation efforts, then Leidos did not need to include documentation regarding remediation efforts and its PAT was not incomplete in this respect.

Second, and more importantly, it appears that Leidos' section 508 conformance issues were the result of incorrect documentation rather than non-conforming software.  Moreover, as explained below, this error would have been obvious to CMS.  Recall that by Sparksoft's count, Leidos' PAT states that the software to be used "does not support 11 of the applicable standards and only partially supports 20 of the applicable standards."  Pl.'s MJAR at 15 (emphasis omitted).  But of these fully or only partially supported standards, all eleven of the standards that are not supported and eighteen of those that are only partially supported relate to the MicroStrategy software supplied by CMS that will be used by whichever company is the successful awardee of the contract.  AR 615, 698 (noting that MicroStrategy version "11.3" is procured by "CMS Enterprise License Agreement"); AR 678 (listing MicroStrategy as software procured through a CMS Enterprise License Agreement); *see also* AR 610 (advising quoters that they should assume that "the Contractor will acquire and supply all needed software *except* those provided via CMS Enterprise License Agreement" (emphasis added)).  In other words, Sparksoft's argument (aside from the two partial conforms related to another software product) relates to a software—MicroStrategy—that complies equally to section 508 standards for all offerors because all offerors must use this software supplied by CMS.  Thus, the PAT that Sparksoft protests relates more to this particular software than to a particular offeror.

Therefore, when Sparksoft claims that Leidos's PAT demonstrated that Leidos' proposal was unacceptable or should have resulted in a "Low Confidence" rating, it stretches the implications of Leidos' failure to properly fill out its PAT.  What Leidos's admittedly flawed PAT actually showed was that "based on information Leidos obtained from MicroStrategy, the MicroStrategy software to be supplied by CMS under this contract does not meet all Section 508 criteria."  ECF No. 35 ("Def-Int. Reply") at 10; *see also id.* (admitting that "[t]he notional PAT submitted by Leidos had not been completed correctly").  Obviously, it would have been unreasonable to have rendered Leidos's bid unacceptable or have given it a "Low Confidence" rating because of "non-compliant" software that the awardee of the task order would eventually have to utilize.

---

[6] Pl.'s MJAR at 14.

Accordingly, Leidos's rating of "Some Confidence" was reasonable given that eleven of the standards that Leidos indicated are not supported and eighteen of those that Leidos indicated are only partially supported relate to the MicroStrategy software supplied by CMS. It appears that Leidos submitted a PAT for an earlier version of the software than the version that will actually be used for the contract, and this earlier version was not as compliant with the section 508 standards as the actual version to be used. While this fact might undercut CMS's confidence in Leidos, the "Some Confidence" rating that Leidos received for Factor 5 reasonably reflects that lesser confidence. As CMS would have known independently, or from the PATs submitted by Sparksoft and ███████, that MicroStrategy did, in fact, comply with all applicable section 508 standards, a rating of "Some Confidence" was both reasonable and within the agency's discretion.

Moreover, to the extent that the two "partially compliant" answers Leidos gave for the IBM Digital Experience Manager software, which is also covered by its PAT, affect Leidos' Factor 5 rating, a "Some Confidence" rating is still reasonable even if the software at issue is not fully compliant. Despite Sparksoft's insistence that Leidos's PAT must render its submission unacceptable, nothing in the RFQ required bidders to submit PATs demonstrating total compliance with all applicable section 508 criteria. The RFQ simply stated that the bidders were to be evaluated based on their "understanding of the requirements and ability to meet applicable accessibility standards." AR 504. Furthermore, as the Federal Circuit has made clear, "[c]ompliance with Section 508 is not an all-or-nothing attribute of a product[] requiring perfect compliance or disqualification." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 (Fed. Cir. 2011). Thus, Sparksoft's claim that section 508 compliance was a minimum requirement for an acceptable proposal finds refuge in neither the solicitation nor the law. The "Some" rather than "High" confidence rating Leidos received on Factor 5 reasonably reflects Leidos' only partial compliance with the section 508 standards regarding the IBM Digital Experience Manager.

### 3. CMS's Evaluation of Factor 3: Technical Understanding and Approach

Next, Sparksoft protests CMS's evaluation of Sparksoft under Factor 3, Technical Understanding and Approach. According to Sparksoft, "[t]he record reflects that [CMS] made several erroneous findings that were critical of Sparksoft's Factor 3 quotation and irrationally rated it as Low Confidence." Pl.'s MJAR at 19. Sparksoft asserts that a "substantial number" of CMS's Factor 3 findings were in error, "because they were contrary to the Solicitation's instructions and constituted disparate treatment of vendors." *Id.* In addition, Sparksoft claims that "[s]everal other findings are irrational because they ignored parts of Sparksoft's quotation, made unsupported assumptions regarding Sparksoft's quotation, and/or were contrary to the Solicitation's instructions and evaluation scheme." *Id.* Sparksoft concludes that, "[b]ut for these erroneous findings, [CMS] would have rated Sparksoft's quotation higher under Factor 3, in which case Sparksoft would have had a substantial chance of award." *Id.*

Sparksoft's Factor 3 arguments suffer from at least three flaws. A simple analogy easily explains these flaws in Sparksoft's argument with regard to Factor 3. Let us suppose that a university required applicants to submit a personal statement, a transcript of high school grades, SAT scores, letters of recommendation, and answers to essay questions. And then suppose the

university ranked an applicant low confidence for admission because it determined that the applicant only submitted a personal statement and none of the other required information.  In response, the hypothetical applicant challenges his low confidence rating with the university by arguing that he included the required grades in his personal statement and directing the university to a place in the personal statement where the grades for one of his four years of high school appear.  The hypothetical student also argues to the university that he is being treated disparately because the university ranked one of his classmates as high confidence for admission, and, in her application, she included two letters of recommendation but also mentioned that if the university needed more letters of recommendation, she would be happy to supply them.  According to this hypothetical student, his low confidence for admission ranking should be upgraded to high confidence for admission because his grades were included in the personal statement, and he is being disparately treated from his classmate with regard to letters of recommendation because she did not include all of her potential letters of recommendation with her application.

It does not take much to see all of the flaws in this hypothetical student's argument.  First, he ignores his failure to provide his SAT score, letters of recommendation, and answers to essay questions.  Second, he did not provide a "transcript of high school grades" as required by the university but instead attempted to argue that the equivalent of a transcript exists in his personal statement in which he included *one* year of high school grades.  Third, an offer to provide *additional* letters of recommendation instead of simply providing such letters is not the equivalent of not providing any letters of recommendation at all.

Unfortunately for Sparksoft, its argument with regard to Factor 3 suffers from all of the same flaws as this hypothetical student's argument.  First, even if all of Sparksoft's Factor 3 arguments were correct, they would still not prove enough.  Although Sparksoft attempts to address several of the areas that resulted in it receiving a "Low Confidence" rating for Factor 3, there are several more areas of its Factor 3 proposal that CMS identified as problematic.  These unaddressed areas standing on their own could reasonably have resulted in a "Low Confidence" rating for Sparksoft on Factor 3.  Therefore, by leaving unaddressed several other problems CMS identified with Sparksoft's Factor 3 proposal, Sparksoft is simply unable to show that the Factor 3 evaluation was unreasonable.  For example, Sparksoft fails to address CMS's findings that:

- [Sparksoft's] decision to increase scope poses a risk of increased errors, rework, and delays, potentially reducing product and service quality and exceeding the transition budget, according to Figure 4.  Roadmap and Timeline, the respondent adds additional work, complexity and amplifies risks by establishing the ████████ ████████ and ████████████████ during the Transition-In period. These two product deployments are not specified in PWS Section 5.1.1, Transition-In.

- [Sparksoft's] scheduling for planned innovations lacks accuracy due to inconsistencies between the written narratives explaining the schedule and Figure 4 Roadmap and Timeline.  Consequently, the TEP expressed concerns about the reliability of the contractor's scheduling.

- [Sparksoft] indicates that its Project Management Professional (PMP) includes the Agile ceremonies it will conduct.  It also mentions outlining its communication

approach, maintaining its risk and issue log in JIRA, an initial project schedule focused on the features and capabilities, and a QAP.  However, it does not explain how it **satisfies the requirements of PWS Section 5.2.2, such as communicating its staffing plan, change management plan, development plan, and IV&V planning**. CMS understands the differences associated with agile processes but expects the respondent to explain how it satisfies each of these requirements in an agile-friendly manner.

- [Sparksoft] indicates that it will present to CMS a suitable candidate for investing energy in prototyping each quarter, but it never acknowledges it will deliver a white paper as specified in the PWS; the format is unclear.

- [Sparksoft] indicates it will build a flexible, self-service analytic workspace where users can perform large-scale, complex analytical data experiments involving mathematics, statistics, programming/SQL, and machine learning.  This workspace will support R, Shiny, and other data analytics tools.  However, the respondent does not explain when, how, or why, posing cost, schedule, and quality risks.

AR 1957–58 (emphasis in original).  To demonstrate that CMS irrationally evaluated Factor 3, Sparksoft needed to show that all of these issues (and several more) were unreasonably evaluated.  Yet, Sparksoft's MJAR is silent on these deficiencies.

Second, with regard to those parts of CMS's Factor 3 analysis that Sparksoft actually addressed in its MJAR, it failed to sufficiently point the Court to anything in the administrative record that would even begin to call into question the "Low Confidence" rating CMS assigned Sparksoft.  For the fourteen "alternative technologies or methods" that Sparksoft proposed to use,[7] CMS determined that Sparksoft did not provide "a detailed description of the cost-benefits analysis and describe the associated risks" as required by the RFQ.  AR 1955, 1958.  Sparksoft argues that CMS made this finding due to an irrational interpretation of the RFQ's requirements. Pl.'s MJAR at 23–25.  But rather than offer specific places in the administrative record for the Court to find the information that Sparksoft claims was included, and CMS determined was missing, Sparksoft largely relies on smoke and mirrors to attempt to prove that CMS erred in its Factor 3 evaluation.

Sparksoft claims that, while the required information was not included in its Factor 3 proposal itself, it instead "included all information reasonably necessary to assess the technical merits of the new technologies, processes and applications in question in its Factor 3 quotation and included all information necessary to assess the level of effort required for Sparksoft's technical solution in the price quotation [portion of its proposal]."  Pl.'s MJAR at 20.  Sparksoft thus alleges that the agency erred by irrationally interpreting the RFQ's instructions regarding Factor 3, "to require vendors to essentially include, as part of their Factor 3 technical quotations,

---

[7] The fourteen "alternative technologies or methods" are the " ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ " AR 1958.

a detailed cost proposal for each new distinct technology, process or application included in the vendor's technical solution." *Id.*

Throughout the procurement process, CMS informed prospective bidders multiple times that they "may propose the use of alternative technologies or methods when advantageous"; however, if they did so, they must also "provide a detailed description of the cost-benefit analysis and describe the associated risks." AR 631 (responding to Question 42); *see also* AR 603 (amending the general assumptions quoters were to use in preparing their quotes), AR 674 (responding to Question 155), AR 675 (responding to Question 161).  Notably, Sparksoft claims that "[t]his provision was added as part of the Q&A process and did not explicitly state whether details for the cost-benefit analysis were to be included as part of the Factor 3 response or as part of the price quotation." Pl.'s MJAR at 21.  In Sparksoft's case, this is a distinction without a difference because the required cost-benefit analysis and risks assessment appears nowhere in its proposal.

CMS found that the proposal "provided insufficient details concerning the numerous projects/innovations it schedules over a two-year period, and did not submit the required benefit-cost analysis and risks for these projects . . . .  Sparksoft also proposes to adopt approximately ten (10) new technologies and tools without adequately explaining when or how this would occur.  It does not provide the required cost-benefit analysis and risk assessment." AR 2041; *see* AR 1955–59 (detailing the evaluators' findings regarding the lack of cost-benefit information provided by Sparksoft).  Furthermore, the evaluators found that Sparksoft's price quotation "doesn't describe when and how it will deploy a total of [ten] (10) new technologies, tools, and services," and it does not "describe the resulting labor hours needed to track licensing and maintenance, or execute the installation, configuration, integrate with existing systems, maintenance, and security and compliance measures for these new technologies." AR 1960.

Sparksoft asserts that all the required information is in its proposal; however, Sparksoft's assertion suffers from two fatal flaws.  First, it was Sparksoft's obligation to "provide a detailed description of the cost-benefits analysis and describe the associated risks," AR 631, in a manner that was clear and could be identified by CMS within Sparksoft's proposal. *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 382 (2019) ("'An offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency.'") (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009)).  Sparksoft's failure to a submit a well-written cost-benefit analysis and description of the associated risks is an error by Sparksoft—not CMS.

Interestingly, Sparksoft never actually claims in its MJAR that it provided "a detailed description of the cost-benefits analysis and describe[d] the associated risks." AR 631.  Rather, Sparksoft claims it satisfied this requirement by "includ[ing] the technical details of its proposed new technologies, processes and applications in its Factor 3 quotation . . .  [and] all the details regarding the required level of effort and cost in the price volume." Pl.'s MJAR at 22–23.  Thus, according to Sparksoft, "the price quotation provided all the information that the Agency needed to evaluate the level of effort required to enact the new technologies, processes, and applications discussed in Sparksoft's Factor 3 quotation." *Id.* at 23.  In other words, Sparksoft's own MJAR

does not claim that its proposal contained a cost-benefit *analysis*, it simply claims it included the costs and the benefits.  It seems that, according to Sparksoft, the agency was supposed to do the analysis on its own.  And there is no mention of the requirement to "describe the associated risks."  AR 631.  Obviously, this falls short of even arguing what was required to demonstrate that CMS erred in its Factor 3 evaluation.

Second, even to the extent that including "the technical details of its proposed new technologies, processes and applications in its Factor 3 quotation . . . [and] all the details regarding the required level of effort and cost in the price volume" could constitute a cost-benefit analysis and a description of the associated risks, Sparksoft never bothered to direct the Court to where in the administrative record this information supposedly appears.  Pl.'s MJAR at 22–23.  Instead, Sparksoft asserted that "[i]n accordance with [its] reasonable interpretation of the Solicitation instructions, Sparksoft included the technical details of its proposed new technologies, processes and applications in its Factor 3 quotation."  *Id.* at 22.  And, following this assertion, Sparksoft includes a citation to "*See, e.g.*, ECF No. 22-7 at AR 1491, AR 1522 (discussing the Metadata Delivery initiative)."  *Id.* at 22–23.  The "*see, e.g.*" signal, of course, is employed in legal writing to denote that additional sources exist that also support the proposition but that citing to them would be unnecessary.  THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION 62 (Columbia Law Review Ass'n et al. eds., 20th ed. 2020).  However, where—as here—those citations would provide the *necessary and essential* support for the factual assertions being made, a direct citation to the exact place or places in the administrative record is required.  *See id* at 62, 64.  Instead of directing the Court to pages of the administrative record where the information supposedly existed, Sparksoft chose to provide a citation to material for *one* of the fourteen required cost-benefit analyses.  Pl.'s MJAR at 22–23.  Thus, even assuming that the material exists, Sparksoft never told the Court where to find it, and "it is not the Court's responsibility to scour the . . . record in search of evidence that may or may not exist to advance Plaintiff's case."  *Facility Healthcare Servs., Inc. v. United States*, 158 Fed. Cl. 254, 258 (2022) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")); *see also DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

Finally, Sparksoft claims that, although "Leidos's and Sparksoft's quotations were substantively indistinguishable[, CMS] . . . did not evaluate the quotations equally."  Pl.'s MJAR at 25.  According to Sparksoft, CMS "criticiz[ed] Sparksoft's quotation heavily for proposing . . . new technologies and applications [but] . . . did not make similar observations regarding Leidos's quotation."  *Id.*  Therefore, Sparksoft argues that CMS treated it disparately.  *See id.* at 24–25.  Sparksoft's disparate evaluation claims, however, are not supported by the record.

In order to succeed on a disparate evaluation claim, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals . . . [or] that the agency inconsistently applied objective solicitation requirements between it and other offerors . . . ."  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing cases). Here, Sparksoft asserts that CMS downgraded its proposal for failure to include cost-benefit analyses that were substantively indistinguishable or nearly identical to cost-benefit analyses

Leidos did not include in its proposal but for which Leidos was not downgraded.  Pl.'s MJAR at 24–27.  There are at least three problems with Sparksoft's argument.



First, Leidos' proposed use of two new technologies—█████████████████████ —was tentative, and not part of its overall solution to CMS's NDW needs.  With regard to ████████, Leidos' proposal explains that it may use ████████ "[w]ith CMS concurrence" if it is unable to obtain ████████████. *See* AR 1166.  Leidos' proposed use of ████████████████ is similarly tentative, indicating only that it would potentially utilize the service in the future.  AR 1170 ("The team will continue to seek opportunities to enhance the NWD Solution and evaluate ████████████ to augment █████████████████████.").  In short, Leidos' proposal did not affirmatively propose to use either ██████████ or ████████████████ whereas Sparksoft affirmatively proposed to use ten new technologies.  This crucial difference does not make the proposals substantively indistinguishable or nearly identical.

Second, even to the extent that Leidos affirmatively proposed using two new technologies, the proposed use of *two* new technologies is different than Sparksoft's proposed use of *ten* new technologies and *four* new projects, for which it did not include a cost-benefit analysis or discussion of associated risks.  Third, it appears at least arguable that there is a cost-benefit analysis included with Leidos' proposed two new technologies.  For example, Leidos provided a discussion concerning the benefits associated with ████████████████.  AR 1170 (including Figure 3.3.5-2, titled "████████████████ Benefits").  Leidos also discussed benefits associated with a potential migration to ████████████ and its efforts to "minimize cost and risk" if it was unable to obtain ████████████████████████.  AR 1166. While the information included likely does not fully satisfy CMS's requirements, given the fact that the uses of these two technologies by Leidos was tentative and it made some attempt to analyze costs and benefits, Sparksoft did not demonstrate that CMS disparately evaluated the competing Factor 3 proposals.

#### 4.  CMS's Best Value Determination Was Reasonable

Finally, Sparksoft argues that CMS's best value determination was in error.  To this end, Sparksoft makes two arguments.  Pl.'s MJAR at 28–32.  First, Sparksoft makes the derivative argument that the "best value tradeoff analysis and decision to award the task order to Leidos was irrational because the underlying evaluation upon which the Agency based its decision is inaccurate and inconsistent with the Solicitation."  Pl.'s MJAR at 28–29.  Second, Sparksoft asserts that "the best value tradeoff analysis and decision was also arbitrary and capricious because the Agency failed to follow the Solicitation's evaluation criteria for the best value tradeoff analysis."  *Id.* at 29.

Turning first to Sparksoft's derivative challenge to CMS's best value determination, because all of Sparksoft's underlying challenges with regard to CMS's evaluations of Factors 1, 5, and 3 were unsuccessful, Sparksoft's derivative challenge to CMS's best value determination necessarily fails.  *See, e.g., Newimar S.A. v. United States*, 160 Fed. Cl. 97, 133 (2022) ("A derivative best-value challenge cannot stand on a rejected challenge to another aspect of the agency's evaluation."); *AccelGov, LLC v. United States*, 163 Fed. Cl. 43, 56 n.8 (2022) (rejecting

derivative best-value tradeoff challenge where the protester had failed to succeed on its evaluation challenges); *IT Enter. Sols. JV, LLC v. United States*, 132 Fed. Cl. 158, 174 (2017) (rejecting derivative challenge to the agency's best value determination because the underlying evaluation was reasonable).

Sparksoft's second challenge to the best value determination fails as well.  Simply put, it has not demonstrated that CMS failed to adhere to the terms of the RFQ with regard to how CMS weighed the relative merits of the various factors that were evaluated, including price. According to Sparksoft, the Contracting Officer "disregarded Sparksoft's clear superiority in Factors 4-6, and in the price factor, in favor of Leidos' marginal advantage in Factors 1-3."  Pl.'s MJAR at 31.  In other words, Sparksoft protests that CMS did not give appropriate weight to Sparksoft's "clear superiority" in the three *least important* non-price factors and the price factor, which the RFQ made the least important of all of the evaluation factors, relative to Leidos' advantage in the three *most important* non-price factors.  *Id*.  This argument lacks merit.

Rather than incorrectly weighing the factors, the Contracting Officer—who has "substantial discretion to determine which proposal represents the best value for the government," *E.W. Bliss Co.*, 77 F.3d at 449—specifically noted Sparksoft's advantage in Factors 4, 5, and 6, consistent with the relative weight the RFQ assigned to all of the evaluation factors.  AR 2047.  She then reasonably concluded that Leidos' superiority in the more heavily weighted factors represented the best value to CMS.  AR 2047–48.  The administrative record demonstrates that the Contracting Officer followed the terms of the RFQ and reached a reasonable best value determination based on the underlying evaluations of the various factors and the relative merits of the quotes.  AR 2043–48 (summarizing the various considerations the Contracting Officer took into account in reaching her best value decision).  Sparksoft's disagreement with the Contracting Officer's exercise of her discretion and judgment does not provide a basis for the Court to second-guess CMS's best value tradeoff decision.

### 5.  Sparksoft is Not Entitled to Injunctive Relief

The Federal Circuit has explained that the following factors must be considered before entering a permanent injunction, whether: "(1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief."  *ACI Techs., Inc. v. United States*, 161 Fed. Cl. 58, 87 (2022) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).  Moreover, as the Federal Circuit has made clear, "*proving success on the merits is a necessary element for a permanent injunction*, but [courts] may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief."  *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 34 (2022) (emphasis added) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018)) (internal marks omitted).  As Sparksoft has not succeeded on the merits, the Court need not balance the three other factors, and Sparksoft is not entitled to injunctive relief.  *ACI Techs.*, 161 Fed. Cl. at 87 (2022).

## CONCLUSION

For the reasons set forth above, Sparksoft's motions for judgment on the administrative record and for a permanent injunction are **DENIED**.  The cross-motions for judgment on the administrative record filed by the government and Defendant-Intervenor are **GRANTED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

<div style="margin-left:40%;">

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

</div>